Filed 11/5/25  In re E.F. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.F. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CARLOS F. et al., <br><br> Defendants and Respondents. | F089499 <br><br> (Super. Ct. Nos. 24CEJ300116-1, 24CEJ300116-2) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Daniel C. Cederborg, County Counsel, Peter Wall, Interim County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Appellant.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Respondent Carlos F.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Respondent A.E.

-ooOoo-

This appeal concerns two minor children, A.F. and E.F. (collectively, the children), who are the daughters of A.E. (mother) and Carlos F. (father) (collectively, the parents). The Fresno County Department of Social Services (department) filed a Welfare and Institutions Code section 300 petition alleging physical abuse of A.F.[1]  Department now appeals the juvenile court's finding that the children were not at risk of substantial harm under section 300, subdivision (a), (b)(1), or (e), and challenges the dismissal of the dependency petition.  We find no error and affirm.

## STATEMENT OF THE CASE AND FACTS

### *Background*

On June 19, 2024, department received a referral of possible physical abuse concerning one-month-old A.F., after she was taken to the emergency room at Valley Children's Hospital (VCH) with a swollen arm.  A.F.'s primary care physician had instructed the parents to seek care at the emergency department.  A bone survey showed numerous fractures, possibly in different stages of healing.  The parents denied anyone else provided care for her and denied any knowledge of how the injuries occurred.  Maternal grandmother was supervising parents' other child, two-year-old E.F.

Physician Kalya Barnes described the bone survey as showing " '[m]ultiple healing fractures with associated periosteal reaction, including a left diaphyseal humerus fracture, the right distal radial metadiaphysis, and metaphyseal corner fractures of the bilateral distal radii and ulnae, bilateral distal femurs, bilateral proximal and distal tibiae, bilateral distal fibulae, and right proximal fibula.  There is also a suspected healing fracture at the base of the right first metatarsal.  Multiple bilateral healing rib fractures are seen, including the left anterior third, fourth, fifth and sixth ribs and the right anterior third, fourth, fifth and sixth ribs.' "  Barnes opined that the findings were highly suspicious for nonaccidental trauma, as the placement of the injuries was consistent with

---

[1] All further statutory references are to the Welfare and Institutions Code.

other child abuse cases. Barnes consulted with a radiologist and child advocacy doctor, Dr. Jennie Daly. Barnes noted lab tests were conducted to assess vitamin D levels and to determine if A.F. had any bone disorder or osteogenesis imperfecta (brittle bone) syndrome, but test results were still pending.

That same day, Reedley Police Detective Armenta questioned parents, with social worker (SW) M. LaGrasse present. During questioning, father stated A.F. was born without complications. Hospital notes indicated maternal gestational diabetes, but no delivery complications. Father denied any bone density issues or any issues with mother's childcare. Father believed E.F. could not have been rough enough to have broken some of A.F.'s bones, although she had tried to climb on A.F. Father stated that, three days earlier, when he carried A.F., her left arm hung down at her side.

Armenta questioned mother, who stated she was the primary caregiver, but father helped when he was home. Mother did not think E.F. played rough enough with A.F. to break any of her bones, and E.F. was never left alone with A.F. Mother did report that she and father were cosleeping with A.F. Mother had no concerns with father's care of the children. She noticed A.F.'s arm looked swollen the day before bringing her into the hospital.

While A.F. was in the hospital, E.F. stayed with maternal grandmother, pending further investigation and with the provision that maternal grandfather leave the home due to his "extensive criminal history."

Further medical updates were provided on June 20 and 21, 2024. Daly informed SW A. Marquez that A.F.'s CT scans were normal, and her bone survey revealed several fractures in different stages of healing. Department also learned that, while A.F. had low vitamin D, most of her lab results were negative for any issues. The test for osteogenesis imperfecta was still in progress.

SW C. Font spoke to VCH's Dr. Whitney Kalin, who was adamant that A.F. was " 'clearly abused more than once," as she had over 20 " 'clearly inflicted' " fractures in

3.

various healing stages. Kalin also opined that, while the osteogenesis imperfecta test was not yet done, A.F.'s normal, healthy bone density indicated a lack of osteogenesis imperfecta and a vitamin D deficiency would not explain A.F.'s injuries.

On June 24, 2024, department received an e-mail from VCH indicating that, in addition to the bone survey showing multiple fractures in different stages of healing, an addendum from the radiology department showed no bone demineralization. A.F.'s lab results reflected low vitamin D, but evaluating physicians found no evidence of rickets. These same physicians also concluded that vitamin D deficiency rickets was an unlikely explanation for A.F.'s fractures because the risk of fractures from vitamin D deficiency is not high. The lab reports again confirmed that A.F. had multiple healing fractures, but the bones had normal overall bone mineralization and architecture, and her joints had normal alignment.

Also on June 24, 2024, department informed the parents of the lab result updates, which found, although vitamin D levels were low, that did not explain the fractures A.F. suffered. As a result, a section 300 petition was filed alleging the children were at risk of serious physical harm (§ 300, subd. (a)), mother's and father's failure to protect the children from harm (*id*., subd. (b)(1)), and the severe physical abuse of A.F., a child under the age of five (*id*., subd. (e)). The children were removed from maternal grandmother's home.

### Detention

A detention hearing was held on June 27, 2024. The children were detained from mother and father and placed into the temporary care and custody of department. Jurisdiction and disposition was originally scheduled for July 18, 2024, but rescheduled numerous times and eventually held March 10, 11, and 13, 2025.

### Jurisdiction and Disposition Reports

In its reports, department reported that public health nurse (PHN) Sally Lopez provided the second bone survey for A.F., completed July 1, 2024, which showed

4.

additional healing fractures of the metatarsals that were not clearly visible in the first survey. Mother and father initially interpreted the updated results as meaning that A.F. suffered additional fractures after being removed from their care. However, another PHN clarified for department that these foot fractures were not new, just more visible in the second bone survey. Daly followed up with A.F. on July 31, 2024, and found no new injuries or trauma.

Mother and father were interviewed on July 10, 2024. Mother indicated that she did not believe she needed any services, and she did not believe E.F. could have caused the injuries.

On July 12, 2024, SW K. Cervantes followed up with PHN Gursimran Deol and learned that the tests administered on June 19, 2024, with VCH for osteogenesis imperfecta and bone fragility were found to be negative, ruling out that the fractures were a result of bone fragility. Father denied anyone abused A.F., and asserted there had never been any indication that A.F. was in any pain. Neither parent disclosed any criminal, substance abuse, or dependency history. Mother stated that she told the doctor the week prior to the hospital visit that she could hear clicking or cracking noises coming from A.F.'s ribs when she cried, but doctors told her it was likely loose cartilage.

SW Cervantes also spoke to Daly via phone on July 19, 2024, to discuss mother and father's assertions of how the injuries occurred, as well as the possible medical explanations. Daly eliminated any accidental causes for A.F.'s injuries. While mother and father's cosleeping with A.F. and rolling onto her could cause rib fractures, it would not cause leg or arm fractures. Daly also rejected pulling on A.F.'s arms and legs during doctor visits or regular diaper changes as possible explanations. Daly opined that A.F.'s fractures were not consistent with a squeezing motion, but rather excessive bending force. Daly opined that several fractures to the area of the knee, legs, and ankles indicated "aggressive pulling of the legs or aggressive shaking." Daly concluded the injuries were

5.

suspicious for abuse as mother and father gave no story to explain the injuries. Daly was also concerned that A.F. was underweight due to malnutrition.

SW Cervantes also asked Daly about the additional fractures noted in A.F.'s second bone survey. Daly explained these "metatarsal" fractures were questionable and due to the small size might not be confirmed until in the healing stages, which was why they might have been missed in the first survey. When asked why A.F.'s low vitamin D was not considered to be an explanation for A.F.'s fractures, Daly explained that vitamin D deficiency was not enough on its own to cause the fractures, and there would also need to have been bone demineralization. The radiology notes for A.F. indicated healthy bones with no concerns for demineralization, and thus no fragile bones caused A.F.'s fractures.

In meetings with mother and father on July 23, 2024, father stated that he thought E.F. rough housing with A.F. might have caused the fractures, but mother disagreed. Mother had been informed by PHN Deol that low vitamin D is very common among children who are breastfed.

Department held separate family reunification panels for mother and father to discuss whether it would be appropriate for department to recommend reunification services despite the applicability of bypass provisions pursuant to section 361.5, subdivision (b). When asked to explain their understanding of department's involvement, father responded that it was because a doctor had made allegations that he and mother were abusing their children. Mother stated it was due to the finding of 20 fractures on A.F. which had no explanation. Both parents thought the fractures might be due to low vitamin D or medical reasons. Both thought the second bone survey showed additional fractures which had occurred since A.F. was removed from their care. Both parents denied needing services or needing to change anything about their parenting style. Both also indicated a willingness to do what was needed to have the children returned to their care. Neither parent had previously received reunification services, both denied

substance abuse issues, neither had a criminal record, and both denied any domestic violence concerns.

On July 24, 2024, department received additional medical information pertaining to A.F.'s vitamin D levels and bone health. The VCH orthopedic department notes referenced the initial vitamin D deficiency, abnormal alkaline phosphates and phosphorus levels, but skeletal fragility genetic testing came back negative. Daly's medical notes from July 31, 2024, indicated A.F.'s health history as having no acute or chronic medical conditions and a birth with no reported complications. A.F.'s phosphorus and vitamin D levels were now normal and she no longer needed supplements, but her body mass index was low for her age. The report also stated that the heart murmur noted at the June 26, 2024 exam was determined to be an "innocent flow murmur," resulting in a normal cardiac exam.

On August 27, 2024, Daly confirmed that A.F. had no signs of any new fractures and was healing. A.F.'s bones appeared " 'healthy and well mineralized' " and a full genetic panel showed no genetic disease. Daly indicated no further exam by the child abuse clinic was necessary at this stage.

On September 5, 2024, mother stated that she believed A.F. had Ehlers-Danlos Syndrome (EDS) because a doctor had determined that after seeing mother's own medical records.

A.F. was examined by Dr. Sara Moassesfar, an endocrinologist, on December 12, 2024. Referencing earlier lab results, Moassesfar concluded that vitamin D deficiency or rickets was "typically not associated with such extensive bone[] fractures unless trauma is involved." Moassesfar explained that nothing suggested A.F. had "weak bones" and it was " 'very unlikely for fractures that severe to occur without some form of trauma.' " Moassesfar did not hear any popping or cracking, as described by mother and father, when picking A.F. up during the appointment.

7.

Mother and father had been visiting the children per court orders and no safety concerns were noted during visitation.

As of January 16, 2025, mother and father had consistently participated and engaged in services offered them at the initial detention hearing, including parenting classes and a child abuse intervention program, and both were working with mental health clinicians. However, department opined that, while mother and father were compliant with their services, they maintained their position that no abuse occurred and that the injuries were due to a medical condition. Department therefore recommended that services be denied pursuant to section 361.5, subdivision (b)(5) and (6).[2]

## *Jurisdiction and Disposition Hearing*

The jurisdiction and disposition contested hearing was held March 10, 11, and 13, 2025. Department submitted on its previously filed motion in limine to exclude or limit the testimony of mother's expert witness Dr. Michael Holick, because he was not qualified as an expert in child abuse or pediatrics and had not conducted his own medical examination of A.F. Children's counsel joined department's objections to Holick. The juvenile court indicated it would make a determination about whether Holick could be called as an expert witness after voir dire the following day.

### *Testimony of Maternal Grandmother*

Maternal grandmother testified as a character witness for mother and father. She testified mother loves her children and was appropriate and loving during visits, which maternal grandmother supervised. She never witnessed any action on mother's part that caused her concern. As for father, maternal grandmother testified that he is gentle with A.F. and neither child feared being with him. Maternal grandmother expressed concerns

---

[2] Section 361.5, subdivision (b) provides that reunification services need not be provided to a parent if the child was brought within the jurisdiction of the court because of the conduct of a parent (*id*., subd. (b)(5)), or the parent caused severe physical abuse to the child or sibling of a child (*id*., subd. (b)(6)(C)).

8.

with A.F., because she could hear A.F.'s back "cracking" when she picked her up.  She noted that A.F. attended physical therapy to help her extend her thumb, which she originally could not do, and to help her sitting up and crawling.

### Testimony of Social Worker Marquez

Much of Marquez's testimony was contained in department's reports before the juvenile court.  Marquez testified that, at the time A.F. was hospitalized, she only had bruising on her left arm.  According to Marquez, the various stages of healing in the fractures meant that the fractures occurred at different times.  She also testified that the child advocacy clinic representative told her that A.F.'s low vitamin D levels did not account for the fractures sustained.  Marquez confirmed that mother had told her E.F. tries to climb on top of A.F. and that mother and father were cosleeping with A.F.

### Testimony of Social Worker Cervantes

Cervantes testified that she had observed mother to be engaged and "very careful" with both children during visits, which had always been supervised.  Cervantes testified to many of the facts already in the reports before the juvenile court.  Cervantes followed up with the doctors when mother asked about the additional fractures discovered during the second bone survey and was told, despite mother and father's belief to the contrary, they were not new fractures.

### Voir Dire of Dr. Michael Holick

Mother filed an expert medical report on February 24, 2025, for Holick, Ph.D., M.D., which stated he was the director of the Ehlers-Danlos Clinical Research Program and director of the Vitamin D, Skin and Bone Research Laboratory at Boston University Medical Center.  The report stated Holick had been practicing as an endocrinologist since 1978; had examined infants, children, and adults with a wide variety of metabolic bone diseases when he started his career; was "nationally and internationally recognized" for his expertise in pediatric metabolic bone disease; had edited a book on perinatal calcium

9.

and phosphorus metabolism; and wrote a variety of articles on "[d]iagnosis and management of pediatric metabolic bone diseases associated with skeletal fragility."

Holick testified that he was a professor of medicine, pharmacology, physiology, biophysics, and molecular medicine; director of Ehlers-Danlos Clinical Research Program; and director of the Vitamin D Skin and Bone Research Laboratory at Boston University School of Medicine. He had been a medical doctor since 1978. Holick testified he was the first to identify "the major circulating form of Vitamin D" as it is measured today.

Holick admitted that he was not a pediatrician, radiologist, or expert in child abuse, and was not qualified as a witness in several states because the hospital no longer allowed him to diagnose infants. He had testified as an expert "about a hundred times" in the field of vitamin D, endocrinology, collagen disorders, including EDS, osteogenesis imperfecta, and in nutrition for both calcium, vitamin D and phosphate.

While Holick acknowledged that the American Academy of Pediatric Guidelines are used for diagnosis of unexplained fractures, he uses them as he "see[s] fit." Holick testified that he reviewed A.F.'s records from VCH, a file from a dentist, X-rays and X-ray reports, but did not physically examine A.F.

Department objected to Holick testifying as an expert witness as his CV was provided to counsel only the day prior, but the objection was overruled. On cross-examination, Holick admitted he is only board certified as an internist for adult disorders, and has been unable to treat pediatric patients at Boston University Medical Center since 2021 when "[he] was terminated."

Following voir dire, department objected to Holick testifying in the field of bone fragility in minors because he was not a pediatrician and did not employ diagnostic criteria for injuries due to child abuse. Children's counsel objected to his testimony regarding A.F.'s medical condition on grounds that he was not board certified in pediatrics, did not demonstrate a background or training in child abuse injuries, and did

not physically examine A.F.  Objections were overruled and the juvenile court did not specify or limit the scope of Holick's testimony.

### *Report and Testimony of Dr. Holick*

Holick had a study published in 2017 entitled "Multiple fractures in infants who have Ehlers-Danlos/hypermobility syndrome and or vitamin D deficiency:  A case series of 72 infants whose parents were accused of child abuse and neglect."  The expert medical report stated that EDS patients have a tendency to fracture and have low bone mass and abnormal bone structure.

In testimony, Holick acknowledged that every child in that study was associated with an allegation of child abuse, but that, in 93 percent of the cases, one of the parents had EDS, which is a "autosomal dominant," meaning the child had at least a 50 percent chance of having EDS.  While Holick found 100 percent of the infants had a medical explanation, a metabolic bone disease, for their injuries, he could not say that they were not also caused by child abuse.  Holick examined 100 percent of at least one of the parents and 64 percent of the infants in the study.  Holick testified that a physical examination is a part of the assessment to determine if an individual has EDS, but acknowledged that he did not do so with all the infants in the clinical study.

Holick's medical expert report stated that patients with EDS have "vascular/capillary fragility that easily predisposes the individual to repetitive micro/macro traumatism with easy bruising and spontaneous vessel rupture."  The report stated that EDS is also indicated by a significant reduction in bone density. Hypermobility syndrome is indicated by a mid-systolic click, easy bruising, varicose veins, and late systolic murmur.  The report stated that EDS is characterized by reduced bone mineral density (BMD) and bone quality and increased prevalence of asymptomatic vertebral fractures.  By performing genome sequencing on a seven-week-old infant, they identified a gene mutation related to bone metabolism that likely caused skeletal fragility.

11.

However, the report also states that there is no identified genetic test to diagnose hypermobility EDS.

Holick testified that EDS symptoms include spitting up constantly, or actual gastroparesis, a loss of weight, joint clicking, mast cell hypersensitivity, and "easy bruisability." Holick testified that mast cell hypersensitivity is identified by the individual blushing easily or profusely. And gastroparesis causes an infant to constantly spit up because their stomach blows up like a balloon and then collapses, causing weight loss. Although not in the report, Holick testified that they look for frontal fonting, or tissue that is connected to the tongue and the bottom of the mouth for bruising or scarring. Holick testified that he also tests shoulders, hips, elbows, fifth digits, and ankles to see if they partially dislocate or click.

According to the expert medical report, Holick was first contacted by mother on July 17, 2024. Holick had a video conversation with mother and father to complete a partial history on July 25, 2024, and saw them at the Boston University School of Medicine's General Research Unit on January 13, 2025. Holick did not review mother's past medical records, but determined her symptoms were consistent with EDS, namely joint hypermobility, flushing and bruising easily, feeling lightheaded when standing up quickly, joint clicks, she sprains easily, mast cell hypersensitivity, soft tissue problems, and chronic widespread pain in two or more limbs, as well as other symptoms. While mother had low vitamin D levels in August 2024, Holick did not obtain lab results for mother when he examined her in January 2025. Holick testified that mother was diagnosed with EDS, hypermobility type (hEDS).

Father did not have any symptoms of EDS.

As for A.F., Holick's report stated that she likely had infantile rickets because she was vitamin D deficient and had low serum phosphorus. Holick opined that A.F. had a 50 percent chance of inheriting EDS from mother. Absent from the report was how Holick relied on mother's reporting that A.F. spit up constantly, that she had joint clicking, that

12.

her skull X-ray showed a "salt/pepper type appearance," indicative of a vitamin D deficiency, or that her phosphate levels being low were consistent with vitamin D deficiency. Holick again acknowledged that he did not physically see A.F., and confirmed that he did not consult with the radiologist, endocrinologists, child abuse clinician, or emergency room physicians who had treated her.

In Holick's opinion, the incidents mother and father reported, such as putting A.F. into her car seat, E.F. climbing on her, or cosleeping, could have caused A.F.'s injuries.

### *Mother's Testimony*

Mother testified that she took A.F. to many doctor's appointments after she was born with jaundice. Mother observed little purple marks on A.F.'s skin where she was held and that the veins on her head and chest were visible. Mother testified that A.F. had a heart murmur at three weeks, and at an appointment with the pediatrician at four weeks, she was prescribed vitamin D supplements because she was being breastfed. According to mother, A.F.'s joints were constantly popping. On cross-examination, mother admitted that she had anatomy scans during her pregnancy and the radiologist did not report A.F. had any broken bones.

Mother testified she noticed A.F.'s arm dangling unusually the Monday before she was hospitalized and noticed swelling in her left arm on that Tuesday. Mother was shocked and confused when she learned A.F. had multiple fractures. Mother insisted A.F. was not abused but that the injuries could have been caused by several incidents, noting that she cried when she moved her arms and legs to change her diaper, when she clothed her, or put her into a car seat, or when E.F. had squeezed A.F.'s arm really tight or was a bit rough with her. But mother also testified it could not be E.F.'s fault because A.F. had fractures everywhere.

13.

### Father's Testimony

Father testified that he was working two different jobs and that he was shocked when he found out A.F. had so many fractures. Father stated that he never harmed A.F. and believed the injuries were caused by low vitamin D.

### Dr. Daly's Testimony for Department

Daly, a child abuse specialist at VCH, testified that she reviewed A.F.'s birth records, her hospital stay records, and her endocrinology records, which showed A.F.'s fractures were in different stages of healing, but that they were no more than five days old when she was first seen on June 19, 2024, ruling out any trauma in utero or during the birthing process. Daly opined that A.F.'s injuries indicated a high suspicion of nonaccidental trauma, due to the sheer number of fractures, the rib fractures, and the metaphyseal fractures. Daly explained that metaphyseal fractures are at the ends of long bones, such as the ends of the femurs, or lower parts of the legs, or the ribs, and those types of fractures were likely a result of child abuse because they happen with a torsion type of twisting or pulling. Daly also noted that the fractured bone in A.F.'s foot is uncommon in a five week old because it would require a lot of force, not the common force used to move legs or change a diaper.

Daly opined that cosleeping was unlikely the cause of the injuries unless a parent laid directly on A.F. Daly testified that it was more likely that compression forces caused the rib fractures. Neither parent told Daly they had rolled on top of A.F. while cosleeping. In addition, it was unlikely that two-year-old E.F. was strong enough to have caused the injuries.

Daly testified that she was familiar with EDS and that A.F. did not present with any clinical findings of the syndrome. Low vitamin D did not necessarily mean bones are weak. There would also need to be demineralization of the bones, but neither was present here, according to the endocrinologist. Both the VCH and Community Medical Centers

endocrinologists had stated that an endocrinologic or metabolic diagnosis did not explain A.F.'s fractures.

### *The Juvenile Court's Ruling*

In its ruling, the juvenile court stated that, from Daly's testimony, it was apparent there were "as low as two" incidents that caused A.F.'s injuries. As for Holick, the juvenile court stated:

> "Although I wasn't particularly overwhelmed by the testimony of Dr. Holick, I'm certainly not going to ignore it. And it does cast – raise some issues as to how this could have happened."

The juvenile court also opined that, had the physician who advised mother to take A.F. to the hospital suspected severe child abuse, he would have called law enforcement to escort them to VCH directly.

As to the parents, the juvenile court stated:

> "I think both of them are good parents, particularly mother. [¶] They don't have any criminal record, no criminal record – no arrest record, there's no alcohol abuse, drug abuse, anger issues. He worked two jobs. . . . [¶] . . . [¶] In any event, I see absolutely and have seen no evidence of any risk to [E.F.]. She's over 2."

The court further stated that it had "some questions" about how A.F. got the injuries, and while it did not know "what it looks like to negligently cause these versus intentionally cause these," it did not think "those particular issues that she may have would cause fractures, but it certainly would make you more vulnerable to them."

Ultimately, the juvenile court ruled department had not met its burden of proof although it was a "close call." The juvenile court dismissed the petition, finding the allegation of the petition not true.

# DISCUSSION

**Did the juvenile court err in finding section 300 did not apply because there was no substantial evidence A.F.'s injuries were not caused by abuse or neglect?**

Department has asked this court to determine whether the juvenile court erred in dismissing the dependency petition. After a review of the record, we find no error.

At a jurisdiction hearing, the juvenile court "shall first consider . . . whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355.) In dismissing the dependency petition, the juvenile court here found department failed to meet this burden.

We apply the substantial evidence standard to affirm the trier of fact's determination. Applying the semantics of this standard to a failure of proof is problematic. As the court in *In re Sheila B.* (1993) 19 Cal.App.4th 187 acknowledges, to " 'find *substantial* evidence in support of a finding of *no* evidence draws the reviewing court into a kind of juridical shell game.' " (*Id.* at p. 199, original italics, quoting *Heap v. General Motors Corp.* (1977) 66 Cal.App.3d 824, 831.) Nevertheless, we agree with the parties that the appropriate standard of review is for this court to determine whether the trial court's order was supported by substantial evidence. Substantial evidence is evidence that is " 'reasonable, credible, and of solid value' "; such that a reasonable trier of fact could make such findings. (*In re Sheila B.*, *supra*, at pp. 198–199; accord, *In re Angelia P.* (1981) 28 Cal.3d 908, 924.)

It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial

16.

court, have no opportunity to observe the appearance and demeanor of the witnesses. "Issues of fact and credibility are questions for the trial court." (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 251; see *In re Heather P.* (1988) 203 Cal.App.3d 1214, 1226, disapproved on other grounds in *In re Richard S.* (1991) 54 Cal.3d 857, 864, 866, fn. 5.) "It is not an appellate court's function, in short, to redetermine the facts. [Citation.] Absent indisputable evidence of abuse—evidence no reasonable trier of fact could have rejected—we must therefore affirm the juvenile court's determination." (*In re Sheila B.*, *supra*, 19 Cal.App.4th at p. 200.)

With these principles in mind, we conclude that the dismissal of the dependency petition was supported by substantial evidence. The juvenile court reached its conclusion based on conflicting evidence and on its assessment of the credibility of the witnesses. The juvenile court explicitly noted in its decision that the medical evidence, while strongly suggestive, was not unequivocal. The court also weighed mother's and father's testimony and their backgrounds, as well as the lack of any evidence of abuse or neglect of E.F., and was persuaded of the truth of their testimony. The testimony of a single witness is sufficient to uphold a judgment, and an appellate court may not evaluate that testimony as a basis for reversal. (*In re Sheila B.*, *supra*, 19 Cal.App.4th at p. 200.)

Our review of the record, in short, does not persuade us that there was indisputable evidence of abuse or neglect of either child. Absent such evidence, we conclude substantial evidence in the record supports the juvenile court's determination that the children did not come within the provisions of section 300, subdivisions (a), (b), and (e). The juvenile court's decision must therefore be upheld, and its order must stand.

**Does section 355.1 apply?**

We briefly discuss one additional argument made by the parties – whether section 355.1 applies. Section 355.1, subdivision (a) provides: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the

17.

result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

"Once the petitioner establishes a prima facie case under section 355.1 the burden of producing evidence 'shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' [Citation.] 'The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' " (*In re D.P.* (2014) 225 Cal.App.4th 898, 903–904.)

Here, it does not appear that the juvenile court made a finding that any injury to A.F. was the result of unreasonable or neglectful acts or omission on the part of mother and/or father. As such, the presumption under section 355.1, subdivision (a) may not have been necessary for the court to apply.

However, even if it did apply, "[s]ection 355.1 merely creates a presumption affecting the burden of producing evidence" (*In re Larissa W.* (1991) 227 Cal.App.3d 124, 132) not the burden of proof, and nothing in the plain language of section 355.1, prohibits the juvenile court from dismissing a section 300 petition when it finds that the allegations of the petition have not been proven by a preponderance of the evidence. (*In re Larissa W.*, *supra*, at p. 132.) Here, mother and father did provide rebuttal evidence, which the juvenile court found credible. The juvenile court did not err in dismissing the section 300 petition.

## **DISPOSITION**

The judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


SNAUFFER, J.